UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ACRISURE, LLC,

      Plaintiff,

                             Case No. 1:22-cv-17

v.

                             Hon. Hala Y. Jarbou

MARC HUDAK,

      Defendant.

_____/

## OPINION

Plaintiff Acrisure, LLC brought suit against Defendant Marc Hudak in state court for breach of contractual non-solicitation and non-competition obligations.  Hudak removed the case to this Court on the basis of diversity jurisdiction and brought counterclaims against Acrisure.  His remaining counterclaims include a breach of contract claim as well as claims for unpaid wages and improper deductions under New York state law.  He seeks damages and a declaratory judgment against Acrisure.  Before the Court are three motions: Hudak's motion for summary judgment as to Acrisure's complaint in its entirety (ECF No. 73), Acrisure's motion for summary judgment as to liability on its complaint (ECF No. 75), and Acrisure's motion for summary judgment as to Hudak's remaining counterclaims (ECF No. 77).  For the reasons stated below, the Court will deny Hudak's motion, grant Acrisure's motion as to liability on its complaint, and grant in part and deny in part Acrisure's motion as to Hudak's remaining counterclaims.

## I. FACTUAL BACKGROUND

Acrisure is an insurance brokerage company headquartered in Michigan.  (Bach Decl. ¶ 4, ECF No. 76-2.)  Acrisure has purchased multiple brokerage agencies that operate independently

as part of the larger company.  (*See* Johnson Dep. 20-21, ECF No. 76-5.)[1]  Defendant Mark Hudak

has been an insurance broker for over 30 years.  (*See* Countercls. ¶¶ 10-11, ECF No. 9.)  This case

involves alleged violations of an employment contract between Acrisure and Hudak.

### A. Acrisure Buys Whitmore

In March 2019, Acrisure bought the insurance brokerage agency Whitmore Group, Ltd.

("Whitmore").  (Bach Decl. ¶ 4.)  At the time, Hudak was working with Whitmore as an

independent contractor.  (*See* Am. Compl. ¶¶ 9-10, ECF No. 2-2.)  As part of Acrisure's

acquisition, Whitmore bought Hudak's book of business for $2,531,781.70 under a Book Purchase

Agreement.  (*See* Hudak Dep. 21-22, ECF No. 76-3.)[2]  That book of business was subsequently

purchased by Acrisure in its acquisition of Whitmore.  (*See* Am. Compl. ¶ 12.)

Acrisure also hired Hudak as an employee, and Acrisure and Hudak executed a contract,

the Employment Agreement.  (Employment Agreement, ECF No. 81-6.)  On the same day, Hudak

also executed a contract, called the Letter Agreement, with James Metzger, the president of

Whitmore.  (*See* Letter Agreement, ECF No. 83-17.)  The Letter Agreement promised Hudak

conditional bonuses based on servicing existing accounts and generating new accounts at

Whitmore.  (*See* Letter Agreement.)  Until September 2020, Hudak worked at Whitmore in

accordance with his Employment Agreement.  (*See* Countercls. ¶ 27.)

### B. The Employment Agreement

Several provisions of the Employment Agreement are central to the parties' dispute.  The

Employment Agreement provides that the accounts Hudak generates are ultimately owned by

Acrisure: "[a]ll business [Hudak] develops and secures" or "services during the term of this

---

[1] Excerpts of the deposition of Tim Johnson, the Executive Vice President Northeast of Acrisure, can also be found at ECF Nos. 73-17, 78-5, and 81-5.

[2] Excerpts of the deposition of Defendant Marc Hudak can also be found at ECF Nos. 78-3, and 81-3.

Agreement shall be the exclusive property of [Acrisure]."  (Employment Agreement ¶ 1.)  The Employment Agreement also addresses Hudak's pay.  It states that his compensation "may be" a 40% commission when he opens a new account, and a 30% commission when those accounts are renewed annually.  (*Id.* ¶ 5; Ex. B. to Employment Agreement.)  It gives Acrisure control over the form of Hudak's pay: "[Hudak]'s compensation may be on a salaried basis, commission basis, or a combination of both – as [Acrisure] determines and/or changes from time to time in its discretion."  (*Id.* ¶ 5.)  It also says that the enumerated commission rates are not guaranteed: "Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as [Acrisure] determines and/or changes from time to time in its discretion during the course of [Hudak]'s employment."  (*Id.*)

The Employment Agreement also sets the timing of Hudak's pay.  It states that Hudak is paid after Acrisure "receives payment of such commission from the insurance or product vendor." (*Id.*)  After receipt, "the commission shall be payable to [Hudak] at the next scheduled commission payment date," so long as Acrisure "received payment of the gross commission from the insurance or product vendor at least five (5) business days before" that date.  (*Id.*)  Once Hudak stops working at Acrisure "for any reason," he "will have earned only those commissions for business [he] obtained during the course of employment."  (*Id.*)  In other words, once Hudak separates from Acrisure, he is no longer entitled to any renewal commissions or commissions on new accounts for which Acrisure receives payment after his departure date.

Additionally, the Employment Agreement contains restrictive covenants that are in force while Hudak works at Acrisure and for two years after "[Hudak's] employment is terminated for any reason."  (*Id.* ¶ 10.)  In sum, Hudak is not to solicit Acrisure's clients or employees, or compete with Acrisure for two years following the termination of his employment.  According to the

Employment Agreement, Hudak "acknowledges that the [restrictive covenants] are reasonable and necessary for the reasonable protection of [Acrisure's] business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to [Acrisure]." (*Id.* ¶ 11.)

### C. The Settlement Agreement

In May 2020, Hudak sued Acrisure, Whitmore, and Metzger over alleged violations of the Employment and Letter Agreements.  (*See* Bach. Decl. ¶ 8; Am. Compl. ¶ 19.)  The parties settled on September 6 of that year.  (*See* Settlement Agreement, ECF No. 73-7.)  Their Settlement Agreement expressly reincorporates the Employment Agreement and specifies that "the Hudak Employment Agreement, the Book Purchase Agreement, and the . . . Letter [Agreement] . . . remain in full force and effect except as modified herein."  (*Id.* ¶ 3.)

The Settlement Agreement describes Hudak's commission rates in similar terms to the Employment Agreement.  The Settlement Agreement also provides for Hudak transferring out of Whitmore to a different Acrisure agency.  (*Id.* ¶ 3(a).)  It provides that Hudak's old Whitmore accounts, and any new accounts generated before March 1, 2021, would stay with Whitmore. (*Id.* ¶ 3(c).)  After that, Hudak's new accounts would go to his new agency, but the accounts already at Whitmore would remain at Whitmore.  (*Id.* ¶ 3(f).)

### D. Hudak's Transition to City

After the Settlement Agreement, Hudak moved to the Acrisure agency City Underwriting ("City").  (Bach Decl. ¶ 10.)  City's president is John Roe, an Acrisure employee.  (Roe Dep. 26, ECF No. 76-4.)[3]  In September 2020, Hudak sent Roe the Employment Agreement and the Settlement Agreement.  (*See* 9/17/2020 Email from Hudak, ECF No. 76-8.)  Around the time that

---

[3] Excerpts of the deposition of John Roe, the President of City Underwriting, can also be found at ECF Nos. 73-8, 78-4, and 81-4.

Hudak began acquiring new clients for City, Roe recalls telling Hudak that City would not be paying Hudak the same commissions that Whitmore had because City's standard rates were different.  (*See* Roe Dep. 57, 60, 63-64.)

On January 7, 2021, a controller at Acrisure named Cindy Loo emailed Whitmore to tell them City was sending over almost $300,000 in revenue from a renewal of one of Hudak's old Whitmore accounts.  (1/7/2021 Email from Loo, ECF No. 76-10, PageID.2126.)  On March 5, Roe forwarded this email to Hudak's lawyer, Robert Angelillo.  In response, Angelillo indicated that City was not sending over all the revenue that it was supposed to, i.e., "all new business generated by Hudak" before March 1.  (3/5/2021 Email from Angelillo, ECF No. 76-10, PageID.2125.)  Roe responded, "I guess we are not on the same page."  (3/5/2021 Email from Roe, ECF No. 76-10, PageID.2125.)

City sent $8,854.63 to Whitmore on March 12, 2021, for accounts that Hudak wrote at City in December 2020 and January 2021.  Hudak claims that because City sent the revenue to Whitmore after March 1, 2021, it was too late for Whitmore to accept the revenue and it returned the money to City.  (Countercls. ¶ 64.)  Roe agreed that "as far as [Whitmore was] concerned, it was too late, they weren't going to add it."  (Roe Dep. 145.)  Roe also claimed that City "sent [the money] right over to [Whitmore]" but [City] had been "paid late on" those accounts.  (*Id.*)  A March 8, 2021, email from Loo indicated that many accounts had not paid City yet, so City couldn't send the money to Whitmore.  (3/8/2021 Email from Loo, ECF No. 76-10, PageID.2122.)  Hudak claims that this situation caused him to lose "thousands of dollars" in bonuses under the bonus structure in place from his Letter Agreement with Metzger.  (Countercls. ¶ 64.)

Another issue between the parties is City's treatment of Hudak overall.  Hudak claims that Acrisure "refus[ed] to establish the infrastructure provided to permit [him] to perform the

5

[Employment] [A]greement." (Countercls. ¶ 7.)  The primary issue Hudak raises is that Roe did not buy Hudak any office equipment.  (*See* Roe Dep. 75-76.)  However, Roe testified that he "showed [Hudak] where his office was," and that the office "included everything he needed." (*Id.* at 76-77.)  Roe also testified that he started transferring Hudak onto City's payroll "very early on."  (*Id.* at 76.)  Additionally, in a letter emailed to Acrisure in August 2021, Hudak's own attorney described Hudak as having "integrated his computer systems into the City Underwriting office."  (8/24/2021 Email from Angelillo, ECF No. 76-17, PageID.2157.)  Roe also testified that City "tried so hard to get [Hudak] . . . in his office."  (Roe Dep.  83.)  Ultimately, however, Hudak appears to have not used the physical office.  (*See* 7/23/2021 Email from Roe, ECF No. 73-13 (Roe: "Do I assume that once you are paid you will start coming into the office once in a while?" Hudak: "I guess once I am an employee of City Underwriting I will have to.").)

### E. Unpaid Commissions

While Hudak worked at City, there were various problems surrounding his commission payments.  City did not make any regular commission payments to Hudak while he worked there, and first paid him commissions in September 2021, after he had stopped working at Acrisure.  (*See* Saladin-Neering Decl. ¶ 14, ECF No. 80.)  The commission issue was, however, limited to Hudak's accounts at City.  The bulk of his accounts were still at Whitmore, and he was receiving his commissions monthly on those accounts.  (*See* Hudak Dep. 33, 38 (testifying that Whitmore does not owe him any commissions).)  City eventually paid Hudak approximately $30,000 in commissions after his resignation, whereas Acrisure paid Hudak, in total, from Whitmore and City, approximately $350,000 of commissions in 2021.  (Saladin-Neering Decl. ¶¶ 12, 16; *see also* Hudak's 2021 W-2, ECF No. 80-3.)

The true explanation for the late commissions is not clear.  Roe's May 24, 2021, email suggests the transition between Whitmore and City was responsible.  (*See* 5/24/2021 Email from

Roe, ECF No. 76-27.)   Similarly, Lois Saladin-Neering, who works for Acrisure's human resources department, associated the unpaid commissions with payroll issues and logistical challenges related to Hudak's unique situation, as he was transferring between agencies within Acrisure but continuing to be paid by both.  (*See* Saladin-Neering Decl. ¶¶ 2, 17-18, 20-24.) Saladin-Neering also claims that Hudak could not be put on City's payroll until he decided whether he wanted to use the Whitmore or City benefits plan.  (*See id.* ¶ 26.)  Saladin-Neering emailed Roe about the benefits issue on July 12, 2021, writing that "*[w]e'll need to confirm a plan for Mar[c]'s benefits before finalizing his transfer to* [City]."  (7/12/2021 Email from Saladin-Neering, ECF No. 80-5, PageID.2762 (emphasis in original).)  Hudak chose his plan three days later, on July 15. (*See* 7/15/2021 Email from Hudak, ECF No. 80-5, PageID.2761.)   At the time, he was still receiving benefits from Whitmore and continued to receive those benefits through the end of 2021, after his departure from Acrisure.  (*See* Saladin-Neering Decl. ¶ 10.)  Saladin-Neering also asserted that the commission payments were slowed by Hudak's disagreements with City about the value of commissions he was owed.  (*See id.* ¶¶ 14, 31-32.)

Hudak offers a different reason for the unpaid commissions.  He claims that "Roe was . . . withholding payment" as an "attempt to coerce [him] into reducing his compensation." (Countercls. ¶ 72.)   Hudak alleges that City tried to force him to amend his Employment Agreement before it would pay him the commissions he had already earned.  (*Id.* ¶ 77.)

### F. Appendix A and the Proposed Amendment

Hudak's commission rates were also a source of tension at City.  Early on, Roe told Hudak that City would pay him different commission rates than Whitmore.  (*See* Roe Dep. 57, 60, 63-64.) In a July 8, 2021, email from Hudak to Johnson, Hudak acknowledged that he "agreed to a 5% reduction in renewal income on any business written after 3/1/21."  (7/8/2021 Email from Hudak, ECF No. 81-12, PageID.3075; *see also* Hudak Dep. 237.)  In other words, when Hudak's clients

at City renewed their accounts, he would get a 25% commission instead of the 30% commission he had received at Whitmore.

A document called "Appendix A" details this commission rate change.  (*See* Appendix A, ECF No. 76-12.)  It states that Hudak will receive a 25% commission on renewals, but it does not change his commission rates on legacy accounts.  (*See id.*; *see also* Roe Dep. 198-99.)  Hudak argues that this document is not enforceable.  The document in the record contains both Hudak and Roe's signatures, dated June 21, 2021.  (*See* Appendix A.)  Roe testified that he and Hudak signed it in person (Roe Dep. 185), but Hudak contends that "Roe's testimony that we signed that document sitting together in his office is false."  (Hudak Aff. ¶ 7.)  On June 21, Hudak emailed Roe and attached Appendix A with only his own signature.  (*See* 6/21/2021 Email from Hudak, ECF No. 83-1.)  Hudak avers that Roe never sent his signature back, and that Hudak "revoked [his] signature" about a month later.  (Hudak Aff. ¶ 8.)  On July 23, 2021, Angelillo emailed Acrisure and wrote that Hudak hadn't yet been given a countersigned Appendix A and was "revok[ing] his signature."  (7/23/2021 Email from Angelillo, ECF No. 73-14.)

Regardless, there is no genuine dispute that the rate change in Appendix A does not impact Hudak's claim.  Appendix A purported to change the commission rate for renewals, but there is no dispute that none of Hudak's City accounts had been renewed by the time he left Acrisure because none of them were over a year old at that time.

Another disagreement between the parties is related to Appendix A's provision on cross-sales.  Appendix A refers to "Cross Sold Accounts with Sub-Producers," for which "Commissions/Fees will be split amongst the Sub-Producers as negotiated by Employee and such Sub-Producers, with the Company's approval."  (Appendix A.)  In Roe's characterization, a cross-sold account would be an account that Hudak voluntarily collaborates on with another City

8

employee, with whom he would share part of his commission.  (Roe Dep. 167.)  Roe claims that Appendix A was meant to allow Hudak to *choose* to do such a collaboration.  (*Id.* at 166.)  This accords with an August 2021 email from Jamie Yadgaroff, the Senior Vice President and General Counsel of Acrisure Northeast and Southeast, who told Angelillo that cross-sales are "[t]otally up to [the] originating producer."  (8/10/2021 Email from Yadgaroff, ECF No. 73-14.)

Hudak denies he had a choice as to whether to use cross-sales and asserts that they were "arbitrarily imposed by Mr. Roe regardless of whether any assistance from a colleague was requested by or given to a producer."  (Hudak Aff. ¶ 14, ECF No. 82.)  He recalls another Acrisure employee, Chris Connors, telling him "'cross-sales' were mandatory," and that he had to give Connors half of his commission "even though Connors hadn't contributed at all."  (*Id.* ¶¶ 16-17.)  Hudak asserts that "Roe re-directed portions of . . . Hudak's commissions under the guise of 'Cross Sale' agreements to other members of his organization."  (Countercls. ¶ 67.)

Changes to Hudak's Employment Agreement were also written in another document, the Proposed Amendment.  (*See* Proposed Amendment, ECF No. 76-26.)  The Proposed Amendment matches Appendix A in its terms.  (*See id.*.)  On July 22, 2021, Saladin-Neering sent Hudak the Proposed Amendment, "for terms discussed with you previously."  (7/22/2021 Email from Saladin-Neering, ECF No. 80-5, PageID.2759.)  She explained that "[y]our acknowledgement will allow us to move forward with key items such as make your transfer to City Underwriting Agency . . . and request payment of your commission to be done 48 hours from the date processed."  (*Id.*)  In other words, City would put Hudak on its payroll and pay him the unpaid commissions once he acknowledged the Proposed Amendment.  (*See* Roe Dep. 160-61.)  Hudak responded that he was "not sure why getting paid is contingent upon getting this agreement since . . . these commissions have been accumulating since January."  (7/23/2021 Email from

Hudak, ECF No. 80-5, PageID.2758.)  Later that day, Angelillo sent an email on behalf of Hudak revoking his signature on Appendix A.  (7/23/2021 Email from Angelillo, ECF No. 73-16.)

### G. Hudak Leaves Acrisure

On August 24, 2021, Angelillo emailed Acrisure a letter claiming the company had violated the Settlement Agreement.  (*See* 8/24/2021 Letter from Angelillo, ECF No. 73-15.)  Angelillo claimed that Hudak was "free[d] . . . from any further obligation" and stated that Hudak was leaving Acrisure.  (*Id.*, PageID.1847.)  On the same day, Hudak filed a lawsuit against Acrisure and City in a state court in New York, alleging breach of the Settlement Agreement, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, and violation of New York labor law.  (*See* N.Y. Compl., ECF No. 73-4.)

On September 8, 2021, Acrisure sent Hudak City commissions totaling $31,101.72.  (Saladin-Neering Decl. ¶¶ 16-17.)  Hudak asserts that this only constituted "a partial payment" of his earned commissions.  (Hudak Dep. 129.)  Hudak claims Acrisure owes him an additional $29,252.54 of earned commissions and bonuses.  (Hudak Aff. ¶ 19.)

After Hudak left City, Acrisure inadvertently paid Hudak an additional $37,985.09 for accounts he had at Whitmore.  (*See* Saladin-Neering Decl. ¶¶ 13, 43.)  Acrisure also accidentally paid Hudak $3,710.76 in 2022 due to "administrative issues."  (*Id.* ¶ 37.)  These late payments are undisputedly in excess of Acrisure's obligations under the Employment Agreement and Settlement Agreement.

Hudak currently works at Barclay.  (*See* Hudak Dep. 42.)  There is overlap between Hudak's current clients and his old Acrisure clients.  (*Id.* at 43-44, 65-66.)  For example, in late 2021—after Hudak left Acrisure—he emailed Nova Construction and Rosemar Construction about moving their accounts to Barclay.  (*See* 10/21/2021 and 11/8/2021 Emails from Hudak, ECF No. 76-23.)  These were Hudak's largest Acrisure accounts, and they have moved with him to

Barclay. (Hudak Dep. 55.) Acrisure contends that many of its clients have gone to Barclay. (*See* Pl.'s Resp. to Def.'s First Set of Interrogs., ECF No. 76-15, PageID.2148; *see also* Acrisure's List of Lost Accounts, ECF No. 76-24.)

## II. LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021) (citing *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013)). "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

"Generally, the materiality of a breach is a question of fact. However, where the facts are undisputed, materiality may be decided as a matter of law." *Konos, Inc. v. Cal. Farms, LLC*, No. 1:16-CV-624, 2018 WL 2739956, at *4 (W.D. Mich. Apr. 27, 2018) (citing 15 Williston on

11

Contracts § 44:55 (4th ed. 2017); *Wal-Mart Real Estate Bus. Trust v. Eastwood, LLC*, No. 13-cv-

1348 (W.D. Mich. May 29, 2015), *aff'd* 708 F. App'x 857 (6th Cir. 2017); *Schupra v. Wayne*

*Oakland Agency*, No. 277585, 2008 WL 2152662 (Mich. Ct. App. May 22, 2008) (affirming

summary disposition over plaintiff's argument that materiality of breach was question for the

jury)).

It is undisputed that Michigan law applies.  Federal courts sitting in diversity apply the

substantive law of the forum state.  *See, e.g.*, *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604,

607 (6th Cir. 2012).  When it comes to contract disputes, Michigan courts consider the Restatement

(Second) of Conflict of Laws.  *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 699

(Mich. 1995).  The Restatement applies the law of the state chosen by the parties as indicated in

their agreement.  Restatement (Second) of Conflict of Laws §§ 186-87 (1971).  The agreements

between the parties state that they are governed by Michigan law.  (Employment Agreement ¶ 18;

Settlement Agreement ¶ 9 (incorporating the Employment Agreement).)

## III. ANALYSIS

### A. Cross Motions for Summary Judgment as to Acrisure's Complaint

Acrisure's complaint has one claim for breach of contract against Hudak.  Specifically,

Acrisure alleges that Hudak has breached the restrictive covenants in his Employment Agreement.

The restrictive covenants have four provisions.  First, Hudak will not communicate "with any

[Acrisure] or Affiliated Entity customer . . . for whom [Hudak] had responsibility, or . . . any . . .

customer or prospective . . . customer about whom [Hudak] obtained knowledge during

employment with the company," in order "to secure business competitive to the products and

services provided by [Acrisure] or [the] Affiliated Entity."  (Employment Agreement ¶ 10(a)(i).)

Second, Hudak will not "[r]equest[], advis[e], or encourage[e] any customer of [Acrisure] or of an

Affiliated Entity to terminate or curtail its relationship with [Acrisure] or Affiliated Entity, or . . .

refrain from becoming a customer or supplier of [Acrisure] or an Affiliated entity." (*Id.* ¶ 10(a)(ii).)  Third, Hudak will not "[r]equest[], advis[e], or encourage[e] any employee, agent, representative or independent contractor of [Acrisure] or an Affiliated Entity to terminate his, her, or its relationship with [Acrisure] or Affiliated Entity."  (*Id.* ¶ 10(a)(iii).)  Fourth, "[Hudak] will not . . . engage in any business in which [Acrisure], or an Affiliated Entity is engaged at the time of termination of employment, in any state in which [Acrisure] or [the] Affiliated Entity transacts business at the time of employment termination."  (*Id.* ¶ 10(b).)

There is no genuine dispute that Hudak is currently working at Barclay as an insurance broker, in direct competition with Acrisure and in violation of paragraph 10(b) of the Employment Agreement.  (*See* Hudak Dep. 43.)  In addition, he has taken many of his client accounts with him from Acrisure to Barclay, including Rosemar Construction and Nova Construction, his two largest accounts, in violation of paragraphs 10(a)(i) and 10(a)(ii).  (Hudak Dep. 44-45.)  He has also hired Theresa Tremanis, who initially worked with Hudak at Barclay, moved to City while Hudak was there, and now works at Barclay once again.  And he admits to having communicated with his clients from Acrisure in October and November of 2021.  (Hudak Aff. ¶ 20.)  Thus, Hudak has undisputedly breached the restrictive covenants in his Employment Agreement.

Despite this, Hudak moves for summary judgment on Acrisure's claim for breach of contract.  The core of his argument is that although he has breached the Employment Agreement, Acrisure committed a first material (referred to in Michigan case law as "substantial") breach which relieved him of any duty to perform his obligations under the agreements.  "He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform."  *Ehlinger v. Bodi Lake Lumber Co.*, 36 N.W.2d 311, 316 (Mich. 1949) (quoting *Jones v. Berkey*, 148 N.W. 375, 378 (Mich. 1914)) (further citations omitted).  The

relevant inquiry for "first substantial breach" cases is "whether a first breach is 'substantial.'" *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 742 (6th Cir. 1998). "A 'substantial breach' is one 'where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party.'" *Jawad v. Hudson City Sav. Bank*, 636 F. App'x 319, 322 (6th Cir. 2016) (quoting *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (Mich. 1964)). Courts applying Michigan law have found that failure to pay various amounts under a contract did not constitute material breach. *Chalk Supply LLC v. Ribbe Real Estate LLC*, No. 345805, 2020 WL 39991, at *7 (Mich. Ct. App. Jan. 2, 2020) (failure to pay a 14% security deposit was not substantial breach); *see also Safeharbor Mgmt. Grp., LLC v. Huston*, No. 1:20-cv-924, 2020 WL 7641822, at *3 (W.D. Mich. Oct. 26 2020) (holding that delayed payment of commissions amounting to less than 10% of an insurance broker's annual income was not substantial breach).

Hudak alleges substantial breach by Acrisure on the basis of six purported breaches: (1) its failure to pay him the proper amount of commissions; (2) its failure to service existing accounts, and new customers before March 1, 2021, through Whitmore; (3) its actions placing Hudak in the middle of a dispute between Roe and Metzger, which resulted in a letter to Hudak from Metzger's attorney; (4) its failure to set up infrastructure for Hudak to work at City, including benefits, office equipment, or payroll; (5) its requirement that Hudak sign the agreement reducing his commissions as a condition precedent to being paid his earned commissions; and (6) when Hudak brought the above issues to the attention of Acrisure executives, they failed to demand that Mr. Roe comply with the September Agreement.

14

Acrisure disagrees.  It moves for summary judgment on the basis that Hudak's breach of his restrictive covenants is undisputed, and that Hudak's defense of first substantial breach fails. Acrisure argues that the defense fails because (1) Acrisure has not breached; (2) even if Acrisure breached, the breach was not material; and (3) even if its breach was material, it was not a material breach that forms a basis for recission of the contract.

Hudak's first asserted breach is undisputed and readily apparent from the available evidence.  Acrisure owed Hudak at least $31,101.72 in commissions at the time he declared Acrisure in breach and departed the company.  He claims that the full amount owed was $60,354.26 and includes in that figure bonuses that he would have been paid by Metzger under the Letter Agreement between him and Metzger.  (Hudak Aff. ¶ 19.)

Hudak's second asserted breach is that Acrisure failed to service existing accounts and new customers before March 1, 2021, through Whitmore.  Hudak asserts that his writing of new accounts at City instead of Whitmore between September 2020 and March 2021 was in breach of the Settlement Agreement.  This assertion is based upon a clause in the settlement agreement that reads: "Hudak's existing accounts . . . and all new business generated by Hudak prior to March 1, 2021 (the 'New Accounts') shall continue to be serviced through Hudak and The Whitmore Group - Agency Operation."  (Settlement Agreement ¶ 3(c).)  Hudak asserts that when he wrote new businesses at City instead of Whitmore, a delay in forwarding funds from City to Whitmore caused him to miss out on bonuses due to him under the Letter Agreement.

This cannot form the basis for a substantial breach for two reasons.  First, Hudak does not contend that his accounts were not serviced.  To the extent that Hudak complains that City serviced his accounts instead of Whitmore, he points to no evidence indicating that such a breach had an impact on him beyond his claimed loss of bonuses, which is not substantial for the reasons

discussed below.  Second, Hudak was a part of the choice to bind new accounts at City instead of Whitmore before March 1, 2021.  (*See* N.Y. Compl. ¶ 45, ECF No. 76-17 ("[S]ince Roe was an Acrisure executive and the President of the branch at which Marc was now supposed to work, [Hudak] wrote the new accounts at City, with confirmation from Roe that the appropriate commissions would be sent to [Whitmore] as required by the [Settlement Agreement].").)  He arguably cannot claim that Acrisure has substantially breached their contract based on his own actions.

Hudak's third asserted breach is that Acrisure placed Hudak in the middle of a dispute between Roe and Metzger, which resulted in a letter to Hudak from Metzger's attorney.  This is not a breach.  There is no clause of the Settlement Agreement or Employment Agreement which give any duties to Acrisure that these events or actions could be in breach of.

Hudak's fourth asserted breach is that Acrisure failed to set up infrastructure for Hudak to work at City, including benefits, office equipment, or payroll.  But it is undisputed that Hudak received benefits from Acrisure throughout his entire employment and for multiple months after his departure.  (Decl. of Saladin-Neering ¶ 11 ("Hudak remained on the Whitmore benefits program through December 31, 2021, months after he resigned his Acrisure employment and instituted litigation against Acrisure").)  It is also undisputed that Hudak had an office and equipment at City.  Roe testified that he "showed [Hudak] where his office was.  That office included a computer, it included a -- an adding machine, for lack of a better term, it included everything he need in that office."  (Roe Dep. 76-77.)  Hudak offers no evidence to dispute these assertions.  Hudak refers to testimony in which Roe admitted that he did not buy anything for Hudak's office.  (Roe Dep. 75-76.)  However, that testimony is entirely consistent with Roe's assertion that Hudak's office already contained what Hudak needed.  If the existing office was

adequate, then it would not have been necessary for Roe to purchase anything.  And as to payroll, nothing in the Settlement Agreement or the Employment Agreement dictated a specific payroll infrastructure, beyond that Hudak would be paid according to a commission schedule and set timing, which is the basis for Hudak's first asserted breach.  Thus, Hudak's fourth asserted breach is unsupported.

Hudak's fifth asserted breach is that Acrisure required Hudak to sign an agreement reducing his commissions as a condition precedent to being paid.  There is no clause in any contract between Hudak and Acrisure that forbids it from presenting him with an agreement to sign regarding his compensation.  In fact, the Employment Agreement specifically allowed Acrisure to change Hudak's commission schedule from time to time in its discretion.  (Employment Agreement ¶ 5.)  Therefore, this assertion identifies no breach beyond the delay in payment, which is already contained in Hudak's first asserted breach.

Finally, Hudak asserts that Acrisure breached by failing to demand that Roe comply with the Settlement Agreement when Hudak brought the above issues to the attention of Acrisure executives.  This does not state a cognizable claim for breach of contract.  There is no clause in any contract between the parties that sets out a reporting structure or procedure to be followed if Hudak believes that Acrisure has breached the contract.

In sum, the only potential breaches of contract that Hudak has shown are for nonpayment of his earned commissions and loss of bonuses from servicing accounts at City instead of Whitmore.  There is some dispute regarding the amount of the commissions and bonuses owed but unpaid.  But neither party disagrees that Hudak was not paid for commissions on his accounts at City prior to his departure.  On the other hand, it is undisputed that Hudak received payment from

Acrisure on all his accounts at Whitmore.  Hudak has stated that the total amount of compensation that he was owed at the time of his departure was $60,354.26.  (Hudak Aff. ¶ 19.)

Weighed in light of the full amount of consideration that Hudak received under the contracts, however, this amount does not rise to a first substantial breach.  Hudak received $250,000 at the outset of the Settlement Agreement, which reaffirmed his restrictive covenants. (*See* Settlement Agreement 4, 5.)  He also received $222,017.26 in commissions in 2019 pursuant to his Employment Agreement.  (Hudak 2019 W-2, ECF No. 80-1.)  He then received $348,439.00 in commissions in 2020 pursuant to the same.  (Hudak 2020 W-2, ECF No. 80-2.)  And he received $353,740.00 in commissions from Acrisure in 2021—$284,653.19 of which was paid before he left the company.  (*See* Hudak 2021 W-2, ECF No. 80-3 *and* Saladin-Neering Decl. ¶¶ 16, 43.)  In total, Hudak received $1,105,109.45 plus benefits as consideration pursuant to the Employment Agreement and Settlement Agreement which contain or expressly reference his restrictive covenants.  In light of his total consideration received, the $60,354.26 in delayed commissions and lost bonuses is not and cannot be a first substantial breach.  *See Chalk Supply*, 2020 WL 39991, at \*7 (holding that "failure to pay a $7,500 security deposit was clearly not a substantial breach" compared to a $54,000 prepayment of other rent).

Hudak also challenges the enforceability of the restrictive covenants that he has breached. Under Michigan law, restrictive covenants are enforceable if they are reasonable in duration, geographic scope, and in the type of activities they prohibit.  Mich. Comp. Laws § 445.774a; *see St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 260, 265 (Mich. Ct. App. 2006).  Hudak's restrictive covenants applied for a period of two years.  (Employment Agreement ¶ 10.)  They generally prohibited solicitation of or interference with Acrisure employees and clients for those two years.

18

(*Id.* at ¶ 10(a)(i-iii).)  They also prohibited competition within any state in which Acrisure operates. (*Id.* at ¶ 10(b).)

"'Michigan courts have not provided any bright line rules' about how long a noncompete can reasonably last." *Viking Grp., Inc. v. Old*, No. 1:22-CV-930, 2023 WL 2730203, at *4 (W.D. Mich. Jan. 18, 2023) (quoting *Certified Restoration Dry Cleaning Net., L.L.C. v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007)).  Courts have, however, upheld restrictive covenants with durations between six months and three years.  *Whirlpool Corp. v. Burns*, 457 F. Supp.2d 806, 813 (W.D. Mich. 2006); *see, e.g.*, *Rooyakker & Sitz PLLC v. Plante & Moran PLLC,* 742 N.W.2d 409 (Mich. App. 2007) (two-year agreement upheld); *In re Spradlin*, 284 B.R. 820 (E.D. Mich. 2002) (five-year agreement upheld); *Certified Restoration Dry Cleaning Network, L.L.C.* (finding a two-year non-compete "tailored in . . . duration" and stating that a two year non-compete is "a period which Michigan courts have consistently upheld as reasonable[.]").  Hudak's two-year restrictive covenants are of a reasonable duration.

Courts have also upheld non-competition covenants with unlimited geographic scope under Michigan law.  *See, e.g.*, *Superior Consulting Co., Inc, v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (holding that a non-competition "agreement can be reasonable if the employer actually has legitimate business interests throughout the world" and holding a noncompete with unlimited geographic scope reasonable when the plaintiff did business in forty-three states and internationally).  The geographic scope of Hudak's non-competition covenant is limited to those states in which Acrisure is doing business, and as such has a tie to its legitimate business interests. This is analogous to the situation in *Walling*.  *See also Lowry Comput. Prods., Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) (holding that a non-compete agreement with an "unlimited geographic scope" was reasonable when the plaintiff did business in 48 states and internationally)

In addition to a reasonable scope and duration, "the employer's business interest justifying such a restrictive order must be greater than mere competition.  In order to be reasonable, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with his employer, but not prohibit the employee's future use of general knowledge or skill." *United Rentals (N. Am.), Inc. v. Keizer*, 202 F. Supp. 2d 727, 740 (W.D. Mich. 2002). Michigan law recognizes the validity of protecting a client base through restrictive covenants.  "An employer has a reasonable business interest in . . . 'restricting its former employees from enticing away the employer's old customers.'" *Frontier Corp. v. Telco Comm'ns Grp., Inc.*, 965 F. Supp. 1200, 1208 (S.D. Ind. 1997) (quoting *Smart Corp. v. Grider*, 650 N.E.2d 80, 83 (Ind. Ct. App. 1995)) (applying Michigan law); *accord*, *Merrill Lynch, Pierce, Fenner & Smitch, Inc. v. Grall*, 836 F. Supp. 428, 434 (W.D. Mich. 1993).  Hudak argues that the clients that he has taken from Acrisure are his long-time customers, most of whom predate his time at Acrisure.  (Hudak Dep. 44.)  That is no defense to breach of his restrictive covenants; in fact, it supports their application. Hudak's relationship with those clients is part of the reason that Acrisure purchased his book of business in its acquisition of Whitmore and hired him. Moreover, the clients are specifically recognized as exclusive property of Acrisure in the Employment Agreement.  (Employment Agreement ¶ 1.)  For Hudak to argue that Acrisure does "not have a legitimate interest in those accounts is simply specious." *Merril Lynch, Pierce, Fenner & Smith, Inc. v. Ran*, 67 F. Supp. 2d 764, 776 (E.D. Mich. 1999) (applying restrictive covenants to long-term clients in securities brokerage industry).

Finally, Courts have upheld non-solicitation and non-interference covenants under Michigan law.  Non-solicitation and non-interference covenants are subject to the same reasonableness requirement as non-compete agreements. *See Apex Tool Group, LLC v. Wessels*,

119 F. Supp.3d 599, 607 (E.D. Mich. 2015) ("[T]he court must determine whether the non-compete/non-solicitation and secrecy agreements defendant signed are reasonable, and, therefore, enforceable.").  "A covenant restricting an ex-employee from soliciting some of the former employer's customers can be valid even absent an express geographical limit, especially where, as is the case here, the employer's legitimate interests arise from the good will the sales representative established with the customers on behalf of that employer." *Frontier Corp.* 965 F. Supp. at 1208-09.  Two-year non-solicitation covenants are also reasonable in duration. *Service First v. Lee*, 2022 WL 3448036, *5 (E.D. Mich Aug. 17, 2022) (two-year agreement upheld).

In sum, Hudak's restrictive covenants are reasonable in scope, duration, and as to the business interests of Acrisure which they aimed to protect.  Hudak clearly violated those covenants and his defense of first substantial breach fails.  Therefore, summary judgment in favor of Acrisure will be entered as to liability on its breach of contract claim.

### B. Acrisure's Motion for Summary Judgment on Hudak's Remaining Counterclaims

#### 1. Breach of Contract (Count I)

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const.*, *Inc.*, 848 N.W.2d 95, 104 (Mich. 2014) (citing *Stevenson v. Brotherhoods Mut. Benefit*, 19 N.W.2d 494, 498 (Mich. 1945)).  Acrisure argues that the six purported breaches identified by Hudak are not breaches and moreover that he cannot recover on a claim for breach of contract because he cannot prove damages.

"Damages are an element of a breach-of-contract claim.  'The party asserting a breach of contract has the burden of proving its damages with reasonable certainty and may recover only those damages that are the direct, natural, and proximate result of the breach.'" *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 200 (Mich. Ct. App. 2017) (quoting *Alan Custom Homes,*

*Inc. v. Krol*, 667 N.W.2d 379, 383 (Mich. Ct. App. 2003)) (internal citations omitted).  "The general rule is that a remedy for breach of contract should make the nonbreaching party whole or put the nonbreaching party in as good a position as if the breach had not occurred."  *Waalkes v. Res. Commc'ns, Inc.*, No. 341505, 2018 WL 4339677, at *2 (Mich. Ct. App. Sept. 11, 2018) (citing *Roberts v. Farmers Ins. Exch.*, 737 N.W.2d 332 (Mich. Ct. App. 2007)).

Hudak claims $29,252.54 of earned but unpaid commissions and bonuses.  (Hudak Aff. ¶ 19; Hudak Suppl. Resp. to Interrog. No. 9, ECF No. 86-4.)  Although it is undisputed that Acrisure paid Hudak $31,101.72 in commissions after his declaration of material breach, his claim is that he is still owed $29,252.54 over and above that amount.  But, after Hudak left City, Acrisure inadvertently paid Hudak an additional $37,985.09 for accounts he had at Whitmore.  (*See* Saladin-Neering Decl. ¶¶ 13, 43.)  Acrisure also accidentally paid Hudak $3,710.76 in 2022 due to "administrative issues."  (*Id.* ¶ 37.)  These payments are undisputedly in excess of Acrisure's obligations under the Employment or Settlement Agreements and in excess of the additional $29,252.54 that Hudak has claimed.  (Hudak Suppl. Resp. to Interrog. No. 9, ECF No. 86-4.)  Because Hudak has already been paid by Acrisure in excess of what he claims he is owed, he cannot prove monetary damages for unpaid commissions or lost bonuses.  Even if an argument could be made for the accrual of interest at a reasonable rate due to a few months of delay in payment, the amount of that interest, when added to his claim, could not exceed the amount of unearned payment that he received.

Finally, Hudak claims that, if not for Acrisure's alleged breach, "presumably Mr. Hudak would still have a job at Acrisure, which would otherwise be expected to last for years to come." (Hudak Resp. Br. 29, ECF No. 87.)  Under Michigan law, "[d]amages must not be conjectural or speculative in their nature[.]"  *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 200

(Mich. Ct. App. 2017) (quoting *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 922 (Mich. Ct. App. 2014)).  Hudak is currently employed by Barclay and has made no allegations of damages resulting from the transition.  Hudak has been compensated over and above any monetary damages that he has claimed and has not asserted any non-monetary damages with sufficient specificity to survive a motion for summary judgment.  Therefore, summary judgment will be granted in Acrisure's favor on Hudak's breach of contract counterclaim.

### 2. Unpaid Wages Under New York Law (Count V)

The core of Acrisure's motion for summary judgment regarding Hudak's unpaid wages claim under New York law is that Hudak, at this point in time, has been paid all commissions that he is owed.  Although that assertion may be true, Acrisure's argument ignores the timing requirements of that law.  New York labor law requires that all wages earned and payable must be paid monthly, and "in no event later than the time provided in the employment agreement and compensation plan."  N.Y. Labor Law § 191(c).  The Employment Agreement between Hudak and Acrisure also specified that he was to be paid monthly, once Acrisure received the funds from clients on the policies or accounts generated by Hudak.  After receipt, "the commission shall be payable to [Hudak] at the next scheduled commission payment date," so long as Acrisure "received payment of the gross commission from the insurance or product vendor at least five (5) business days before" that date.  (Employment Agreement ¶ 5.)  There is evidence that Hudak's pay was delayed by several months, and that he was not paid any City commissions until weeks after his departure, several months after the Employment Agreement provided for.  Hudak left Acrisure on August 24, 2021.  (*See* 8/24/2021 Letter from Angelillo, ECF No. 73-15.)  The first commission payments for accounts written at City were paid on September 8, 2021.  On that date, Acrisure sent Hudak commissions from his City accounts totaling $31,101.72.  (Saladin-Neering Decl. ¶¶ 16-17.)  New York courts have found delays of similar length actionable under New York

labor law.  *See, e.g.*, *Polyfusion Elecs., Inc. v. Promark Elecs., Inc.*, 108 A.D.3d 1186 (N.Y. App. Div. 2013) (granting double damages, attorney's fees, and court costs to a party under § 191(c)(3) because owed commissions were not paid within 5 days of termination of the relationship).  As a result, dismissal of Hudak's unpaid wages claim cannot be entered on the basis that Hudak has *now* received his commission payments.  He may be entitled to additional damages because of any delay.  Accordingly, Acrisure's motion for summary judgment as to Hudak's unpaid wages claim will be denied.

### 3. Improper Deductions Under New York Law (Count VI)

New York law provides that "[n]o employer shall make any deduction from the wages of an employee, except deductions which: . . . are expressly authorized in writing by the employee and are for the benefit of the employee, provided that such authorization is voluntary and only given following receipt by the employee of all terms and conditions of the payment and/or its benefits and the details of the manner in which deductions will be made[.]"  N.Y. Labor Law § 193.

Appendix A, which Hudak signed June 21, 2021, sets forth one instance in which Hudak may authorize a deduction from his wages.  It states that "[c]ommissions/fees will be split amongst the Sub-Producers as negotiated by Employee and such Sub-Producers, with the Company's approval."  In Roe's characterization, a cross-sold account is an account that Hudak collaborates on with another City employee, to whom Hudak would give part of the commission.  (Roe Dep. 167.)  As such, Roe insists that such a collaboration would be completely voluntary; Hudak would have to choose to do so.  It does appear that cross-sale deductions were taken from several of Hudak's accounts while at City.  (*See* Producer Commission Report, attached to 7/23/2021 Email from Loo, ECF No. 78-15 (showing Hudak received a 36% commission on certain SWAVCRE-01 accounts, less than set forth on his commission schedule); *see also* Hudak Aff. ¶ 16 (stating that

24

a fellow City employee demanded a cross-sale share of Hudak's Swavelle/Millcreek Fabrics account).)

Hudak's counterclaim for improper deductions stems from the cross-sale deductions from his commissions while at City.  In Roe's characterization, a cross-sold account is an account that Hudak collaborates on with another City employee, to whom Hudak would give part of the commission.  (Roe Dep. 167.)  Roe claims that Appendix A was meant to allow Hudak to *choose* to do such a collaboration.  (*Id.* at 166.)  This accords with the August 2021 email from Jamie Yadgaroff who told Angelillo that cross-sales are "[t]otally up to [the] originating producer." (8/10/2021 Email from Yadgaroff, ECF No. 73-14.)

Hudak denies that he had a choice as to whether to use cross-sales and asserts that they were "arbitrarily imposed by Mr. Roe regardless of whether any assistance from a colleague was requested by or given to a producer."  (Hudak Aff. ¶ 14, ECF No. 82.)  He has stated under oath that cross-sale deductions were done without notice or his permission.  (N.Y. Compl. ¶ 73.)  He recalls another Acrisure employee, Chris Connors, telling him "that 'cross-sales' were mandatory," and that he had to give Connors half of his commission "even though Connors hadn't contributed at all."  (*Id.* ¶¶ 16-17.)  Hudak asserts that "Roe re-directed portions of . . . Hudak's commissions under the guise of 'Cross Sale' agreements to other members of his organization." (Countercls. ¶ 67.)

There remain material questions of fact regarding whether the cross-sale deductions from Hudak's City commissions were the result of voluntary cross-sale agreements between Hudak and other members of City, or involuntary re-allocations of commissions as Hudak asserts.  For that reason, the motion for summary judgment as to Hudak's improper deductions claim will be denied.

### 4. Declaratory Relief (Counts VII and VIII)

Counts VII and VIII of Hudak's counterclaims seek declarations that Acrisure has committed a first substantial breach, or else that the restrictive covenants are unenforceable. The Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide an independent cause of action. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). A declaratory judgment is a remedy, not an independent claim. *See, e.g.*, *Cruz v. Capital One, N.A.*, 192 F. Supp. 3d 832, 838 (E.D. Mich. 2016). Acrisure moves for summary judgment on counts VII and VIII on the grounds that it is entitled to summary judgment on Hudak's underlying claims. This Court has construed counts VII and VIII as requests for relief rather than independent causes of action. (Opinion, ECF No. 44.) Nevertheless, for the reasons discussed above, Acrisure did not commit a first substantial breach and the restrictive covenants are enforceable. Accordingly, Acrisure is entitled to summary judgment for counts VII and VIII of Hudak's counterclaims, which will be dismissed.

## IV. CONCLUSION

For the reasons stated above, the Court will deny Hudak's motion, grant Acrisure's motion as to liability on its complaint, and grant in part and deny in part Acrisure's motion as to Hudak's remaining counterclaims. The Court will dismiss Hudak's counterclaim in Count I for breach of contract, as well as Hudak's counterclaims in Counts VII and VIII for declaratory relief. Still pending is the determination of damages for Acrisure's breach of contract claim, as are Hudak's counterclaims for unpaid wages and improper deductions under New York labor law. An order will enter consistent with this Opinion.

Dated: July 13, 2023                                       /s/ Hala Y. Jarbou
                                                           HALA Y. JARBOU
                                                           CHIEF UNITED STATES DISTRICT JUDGE