UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ACRISURE, LLC,

    Plaintiff,

v.

MARC HUDAK,

    Defendant.

_____/

Case No. 1:22-cv-17

Hon. Hala Y. Jarbou

## **OPINION**

Defendant Marc Hudak has filed a motion for reconsideration (ECF No. 103) of the Court's opinion on the parties' cross-motions for summary judgment (ECF No. 99). For the reasons herein, the Court will deny his motion.

## **I. STANDARDS**

Under Rule 54(b) of the Federal Rules of Civil Procedure, a non-final order is subject to reconsideration at any time before entry of a final judgment. *See ACLU v. McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010).

> Generally, and without restricting the discretion of the Court, motions for reconsideration which merely present the same issues ruled upon by the Court shall not be granted. The movant shall not only demonstrate a palpable defect by which the Court and the parties have been misled, but also show that a different disposition of the case must result from the correction thereof.

W.D. Mich. LCivR 7.4(a).

A defect is palpable if it is easily perceptible, plain, obvious, readily visible, noticeable, patent, distinct or manifest. *See Compuware Corp. v. Serena Software Int'l, Inc.*, 77 F. Supp. 2d 816, 819 (E.D. Mich. 1999). New arguments "raised for the first time in a motion for

reconsideration at the district court generally [are] forfeited." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331-32 (6th Cir. 2009).

Because Hudak opposes the Court's conclusion that the Acrisure is entitled to summary judgment, the summary judgment standards also apply. The Court must view all the facts and evidence in the light most favorable to Hudak and decide whether there is a genuine dispute of material fact requiring submission of the case to a jury. (*See* 7/13/2023 Op. 11-12, ECF No. 99.)

## II. ANALYSIS

### A. Procedural Challenge

Western District of Michigan Local Civil Rule 7.1(b)(1) limits parties, absent leave of court, to 200 pages of supporting documents. Local Rule 7.1(c) provides that "[i]n its discretion, the court may in a particular case shorten or enlarge any time, word count, or page limit established by these rules, with or without prior notice or motion." Hudak claims that prejudice arose because the Court did not strike Acrisure's briefs for having exhibits totaling more than 200 pages. Hudak asserts that "if he had known that this rule was not going to be enforced, he would have included additional documentation to contradict Plaintiff's claims. This was prejudicial to Mr. Hudak since, as shown below, such documentation could have been determinative." (Def.'s Br. in Supp. Mot. for Recons. 4, ECF No. 103-1.)

The documentation that Hudak references are two email chains between himself and John Roe, President of City Underwriting Agency. Each email chain is about one page in length. Hudak submitted less than 200 pages of exhibits. It is not clear why he felt the need to omit the two pages of evidence whose absence he claims prejudiced him.

Moreover, neither of the emails shed much light on the facts at issue. Indeed, Exhibit B is an email chain discussing a potential move of existing accounts from Whitmore to City in April 2021 that never occurred. As such, it is not of any great probative value. (*See* Hudak Dep. 323-

2

24, ECF No. 76-3.)  In short, the Court has now considered both email chains.  They do not change the outcome of the Court's analysis.  Any possible procedural error is therefore harmless.[1]

**B. Substantive Challenges**

Hudak also asserts errors in the Court's analysis of the merits of Acrisure's motion for summary judgment as to liability on the complaint.  For the reasons that follow, Hudak has not shown that a different disposition of the case is warranted.

**1. Discretion to Change Commissions Under the Settlement Agreement; Time Requirement for Paying Commissions**

Hudak argues that Acrisure breached its agreements with him when it presented him with an amendment to his employment agreement that would reduce his commissions.  In its opinion, the Court stated, "There is no clause in any contract between Hudak and Acrisure that forbids it from presenting him with an agreement to sign regarding his compensation. In fact, the Employment Agreement specifically allowed Acrisure to change Hudak's commission schedule from time to time in its discretion."  (7/13/2023 Op. 19.)  Hudak argues that the Court misunderstood the mandatory payment requirement in the Settlement Agreement.  In his view, the Settlement Agreement eliminated Acrisure's discretion to change his commission rates.

Hudak is mistaken.  The mandatory payment provisions in the Settlement Agreement only apply to "Existing Accounts" and "New Accounts," as those terms are defined in that agreement. The Settlement Agreement states as follows:

> Notwithstanding the foregoing, Hudak's existing accounts, which are identified in Paragraph 1.1 and Schedule 1.1 of the BPA (the "Existing Accounts") and all new business generated by Hudak prior to March 1, 2021 (the "New Accounts") shall continue to be serviced through Hudak and The Whitmore Group – Agency

---

[1] Ironically, Hudak has failed to comply with the Court's local rules when submitting his additional exhibits to the Court.  The rules require attorneys to file all documents electronically unless specific exceptions apply.  W.D. Mich. LCivR 5.7(d). Rather than file his exhibits with the Court (electronically or otherwise), Hudak apparently sent them to chambers and to opposing counsel in paper form.  Because he did not properly file them, the Court could have disregarded the exhibits altogether.  Instead, the Court will require Hudak to file them on the record.

> Operation.  Hudak shall continue to receive a commission of thirty percent (30%) on the Existing Accounts and a commission of forty percent (40%) for the first year of any New Accounts and a commission of thirty percent (30%) after the first year subsequent to the execution of this Agreement as called for in the Hudak Employment Agreement, the Book Purchase Agreement, and the Side Letter, all of which remain in full force except as modified herein[.]

(Settlement Agreement ¶ 3(c), ECF No. 76-7.)

The foregoing paragraph set Hudak's compensation rates for Existing Accounts and New Accounts; those rates were mandatory because of the word "shall" in that paragraph.  But all other accounts were subject to the Employment Agreement, "which remain[ed] in full force except as modified [in the Settlement Agreement]."  (*Id.*)  The Employment Agreement permitted Acrisure to set commission rates as it "determines and/or changes from time to time in its discretion." (Employment Agreement ¶ 5, ECF No. 81-6.)

The Settlement Agreement defines Existing Accounts as those "identified in Paragraph 1.1 and Schedule 1.1 of the [Book Purchase Agreement]," and defines New Accounts as those "generated by Hudak *prior to* March 1, 2021."  (Settlement Agreement ¶ 3(c) (emphasis added).) Accounts generated on or after March 1, 2021, do not fall within either of those definitions. Consequently, for the latter, the Employment Agreement controls, and Acrisure retained the discretion to set commission rates for those accounts.  This interpretation is buttressed by paragraph 3(f) of the Settlement Agreement, which expressly states that compensation for "[a]ll new business generated by Hudak after March 1, 2021 (the "Post-March 2021 Business[")]) . . . will be pursuant to the Hudak Employment Agreement."  (*Id.* ¶ 3(f).)  Accordingly, Acrisure had discretion to change Hudak's commission rates for accounts generated on or after March 1, 2021. It could have changed those rates with or without his permission.

As indicated, Hudak argues that Acrisure breached the Settlement Agreement when, among other things, it presented him with an amendment to the Employment Agreement containing new

4

commission rates that would replace those set forth in the original Employment Agreement. (*See* Proposed Amendment, ECF No. 76-26.) However, the proposed amendment expressly states that the new commission rates "do[] not apply to commissions earned on the Existing Accounts and the New Accounts, as both are defined in the Settlement Agreement[.]" (*Id.*, PageID.2251.) Thus, the new rates did not conflict with the Settlement Agreement. Asking or requiring Hudak to sign an amendment that was consistent with Acrisure's rights under the parties' existing agreements was not a breach of the Settlement Agreement.

But even if Hudak is correct that the Settlement Agreement eliminated Acrisure's discretion to change his commission rates, the outcome is the same. Presenting Hudak with an amendment to his employment agreement did not, in itself, breach any agreement between Hudak and Acrisure. To the extent Acrisure withheld Hudak's commissions until he agreed to sign the proposed amendment, its breach was simply the failure to pay those commissions when they were due. Presentation of the amendment was not an additional breach. Thus, the Court correctly stated that requiring Hudak to sign the amendment "identifies no breach beyond the delay in payment[.]" (7/13/2023 Op. 17.)

Hudak further asserts that the Court has "misconstrued the nature of Plaintiff's withholding of Mr. Hudak's commissions" because "[t]he Court concluded that the Amendment only resulted in a 'delay' in payment." (Def.'s Br. in Supp. of Mot. for Recons. 8.) However, it is undisputed that Acrisure paid Hudak everything he was owed and more after his departure—a fact that he does not dispute in his motion for reconsideration. Hudak accepted those payments. Thus, it is undisputed that Acrisure paid Hudak what it owed him, albeit after the due date under the parties' agreements. The Court correctly characterized Acrisure's conduct as a delayed payment.

5

Furthermore, it is undisputed that, at the time Hudak declared that Acrisure was in breach, the total amount that Hudak claims Acrisure owed him is $60,354.26. (*See* Hudak Aff. ¶ 19, ECF No. 82 ("[E]ven after plaintiff paid me $31,101.72 after I declared the material breach, I was still owed $29,252.54 in commissions and bonus payments.").) That amount is insubstantial when compared to the total amount of compensation that Hudak had already received under the Employment Agreement and the Settlement Agreement, both of which required Hudak to abide by restrictive covenants. (*See* 7/13/2023 Op. 18.) Thus, Acrisure's failure to pay him $60,000 in commissions and bonus payments was not a substantial breach that rendered the restrictive covenants unenforceable.

### 2. Criminal Provisions of New York Labor Law

Hudak asserts for the first time in his motion for reconsideration that, because "an employer's failure to pay wages in violation of the New York Labor Law 'carries both civil and criminal penalties,'" "an employer's failure to pay wages is a material or substantial breach of an employment agreement or other agreement concerning the employee's compensation." (Def.'s Br. in Supp. Mot. for Recons. 10 (emphasis omitted).) He argues that New York courts "construing the impact of these types of violations in similar situations have held that an employer's failure to pay wages is a material or substantial breach of an employment agreement or other agreement concerning the employee's compensation." (*Id.*)

As an initial matter, parties generally cannot use a motion for reconsideration "as an opportunity to re-argue the case and introduce a new argument that could have been presented earlier[.]" *Bank of Ann Arbor v. Everest Nat'l Ins. Co.*, 563 F. App'x 473, 478 (6th Cir. 2014). Hudak does not explain why he failed to raise his contention earlier. By failing to raise the argument, he forfeited it.

6

At any rate, Hudak's argument is not persuasive. The Court must follow Michigan law when interpreting and applying the Settlement Agreement and the Employment Agreement because they both select Michigan law as the governing law. (Settlement Agreement ¶ 9; Employment Agreement ¶ 18, ECF No. 76-6.) Hudak provides no authority for his argument under Michigan law.

The only support cited by Hudak for his position is *Hertzoff v. Diaz*, 533 F. Supp. 2d 470 (S.D.N.Y. 2008). There, a New York district court reasoned as follows:

> The deductions [from plaintiff's wages] allegedly taken by defendants, if proved, would run afoul of [New York Labor Law § 193]. Violation of § 193 carries both civil and criminal penalties. *See* N.Y. LAB. LAW §§ 197, 198-a. Thus, any illegal deduction from wages qualifies as material. Moreover, compensation is, from the employee's standpoint, *the* material term of any employment agreement, so an employer's failure to pay the compensation to which the parties agreed is necessarily material.

*Hertzoff*, 533 F. Supp. 2d at 473.

The court in *Hertzoff* was not discussing the first substantial breach rule, so its reasoning does not apply. Moreover, it does not follow that the violation of a wage law is necessarily a substantial breach where the wage law contains both civil and criminal penalties. The court in *Hertzoff* provided no reasoning for its conclusion and cited no authority to support it. This Court is not aware of any decision by any court, let alone a court applying Michigan contract law, that has followed the reasoning in *Hertzoff*. Thus, the Court is not persuaded that a breach which violates New York Labor Law is a substantial breach.

### 3. Evidence Pertaining to Servicing of the Accounts and Hudak's Bonus

Next, Hudak argues that the Court erred when concluding that "Hudak was a part of the choice to bind new accounts at City instead of Whitmore before March 1, 2021." (Def.'s Br. in Supp. of Mot. for Recons. 11 (quoting 7/13/2023 Op. 16).) As support, Hudak cites the following portion of Roe's deposition testimony:

7

> Q. Right. But the decision to bind it at City as opposed to Whitmore, that was your decision?
>
> A. Yes.
>
> Q. And you were aware at that time that the settlement agreement required that any new business that Marc brought in prior to March 1, 2021, was supposed to go through Whitmore, correct?
>
> A. Right. As was Marc.
>
> Q. Right. But you didn't do that?
>
> . . .
>
> A. What do you mean I didn't do that?
>
> Q. You bound it through City.
>
> A. Right. I think we decided -- specifically Marc and I decided that if we're able to write it, we'll just sent them the money.
>
> Q. Whose decision was it to bind it here?
>
> A. Mine.

(Roe Dep. 104-05, ECF No. 73-8.)

Hudak emphasizes the first and last portions of this exchange as evidence undercutting the Court's conclusion that "Hudak was a part of the choice to bind new accounts at City instead of Whitmore before March 1, 2021." (7/13/2023 Op. 16.) In doing so, he ignores other portions of the same exchange where Roe clarified that "we decided -- ***specifically Marc and I decided*** that if we're able to write it, we'll just send them the money." (Roe Dep. 105 (emphasis added).) Roe also testified:

> A. Keep in mind, there was no other place to bind it. You should know that. ***[Hudak] specifically did not go through Metzger.*** And two reasons. First of all, he was mortal enemies at that point, right. Plus he knew they would never have been able to write it because that's not their business, that's not their thing.
>
> Q. Okay.

8

> A. So *we agreed this is the way to do it* and we could come into some sort of loose compliance by sending them all the money, which we did, every penny.

*Id.* (emphasis added).

The Court did not find that Hudak bound his accounts through City.  Instead, the Court found that Hudak participated in that decision.  Indeed, Hudak's own complaint from the suit he filed in New York states that Hudak "wrote the new accounts at City, with the confirmation from Roe that the appropriate commissions would be sent to [Whitmore] as required by the [Settlement Agreement]." (N.Y. Compl. ¶ 45, ECF No. 76-17.)  Thus, Roe's testimony is consistent with the conclusion that Hudak played a part in the decision to bind new business at City, even though Roe may have been the one who made the final decision.

But even if the Court improperly interpreted the evidence, the outcome would be the same.  Assuming Acrisure breached the agreement by servicing accounts at City instead of Whitmore, Hudak pointed to no evidence indicating that this breach impacted him apart from his claimed loss of commissions or bonuses, which was not a substantial breach for the reasons discussed in the Court's opinion.  (*See* 7/13/2023 Op. 15-16; Hudak Dep. 333, ECF No. 78-3 ("Q. How are you damaged by Acrisure writing new business through City prior to March 1 of 2021?"  Hudak: "I was -- I'm damaged financially.  I'm missing commissions.  I'm missing commissions.").)

### 4. Calculating the Extent of the Breach

Finally, Hudak argues that, when examining the nature of Acrisure's breach to determine whether it was substantial, the Court improperly compared the amount of commissions withheld from Hudak to the total amount of compensation Hudak received in 2019 through 2021 in connection with his employment and his agreements with Acrisure.

Specifically, Hudak objects to the Court's inclusion of a $250,000 settlement payment that Hudak received from Metzger in connection with the Settlement Agreement.  (*See* Settlement

Agreement ¶ 2(a).) Hudak notes that he received that payment from Metzger rather than from Acrisure. However, the source of that payment is irrelevant. The Settlement Agreement reiterated the restrictive covenants in Hudak's employment agreement. (*Id.* ¶ 3(b).) The settlement payment was part of the consideration that Hudak received in exchange for abiding by those covenants. Acrisure is a party to that agreement and can enforce it against Hudak.

Hudak also objects to the inclusion of payments he received in 2019 and 2020 for commissions that he earned while working for Acrisure. Hudak argues that "there is no reason why Plaintiff's prior adherence to its contractual obligations should be used as a mitigating factor for its clear breach of its obligations later." (Pl.'s Br. in Supp. of Mot. for Recons. 13.) On the contrary, Acrisure's prior adherence is plainly relevant to whether its breach was substantial. Among other things, it shows that there was not a complete failure of consideration. Indeed, Acrisure employed Hudak and paid him a substantial amount of money under the condition that he abide by certain restrictive covenants after the termination of his employment. Notwithstanding a dispute with Acrisure over a relatively small sum of unpaid commissions and some concerns about where his accounts were serviced, Hudak "obtained the benefit which he . . . reasonably expected to receive[.]" *Chalk Supply LLC v. Ribbe Real Estate LLC*, No. 345805, 2020 WL 39991, at *4 (Mich. Ct. App. Jan. 2, 2020) (quoting *Able Demolition, Inc. v. Pontiac*, 739 N.W.2d 696, 701 (Mich. Ct. App. 2007)). He even accepted additional payment from Acrisure after he declared it to be in breach. Thus, Hudak apparently wants all the benefits of his agreements without their obligations. The first substantial breach doctrine does not permit such an inequitable result. Accordingly, Hudak cannot escape from his contractual obligations to Acrisure.

### III. CONCLUSION

In summary, Hudak's arguments are not persuasive and do not warrant relief. Any possible procedural error by the Court was harmless. In addition, Hudak has failed to demonstrate a palpable defect that would require a different disposition of the case.

The Court will enter an order denying Hudak's motion.


Dated: August 24, 2023             /s/ Hala Y. Jarbou
                                   HALA Y. JARBOU
                                   CHIEF UNITED STATES DISTRICT JUDGE